MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2026 ME 87
Docket:      Ken-24-563
Argued:      October 8, 2025
Decided:     August 13, 2026

Panel:       STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

DONTE JOHNSON

LAWRENCE, J.

[¶1]  Donte Johnson appeals from a judgment of conviction entered by the trial court (Kennebec County, *Daniel Mitchell, J.*) after a jury returned guilty verdicts on multiple counts of drug trafficking and one count of refusing to submit to arrest.  Johnson argues that (1) a traffic stop on June 5, 2021, was an unlawful arrest and that all evidence flowing from the stop should have been suppressed, (2) the court should have dismissed the case as a sanction for the State's discovery violation, and (3) the sentencing court erroneously "double counted" the quantity of drugs involved when determining the basic and maximum sentences.  We conclude that the trial court did not err by denying the motion to suppress, nor did it abuse its discretion by declining to dismiss the case in response to the State's discovery violation.  Although the sentencing

2

court erred by considering the quantity of drugs for the same purpose in both steps one and two of the three-part *Hewey* analysis, we find that in the circumstances of this case, the error did not affect Johnson's substantial rights. We therefore affirm the conviction.

## I. BACKGROUND

[¶2] On June 7, 2021, the State filed a complaint in the trial court charging Donte Johnson with aggravated trafficking in scheduled drugs (cocaine) (Count 1) (Class A), 17-A M.R.S. § 1105-A(1)(D) (2021),[1] aggravated trafficking in scheduled drugs (fentanyl) (Count 2) (Class A), 17-A M.R.S. § 1105-A(1)(M) (2026), unlawful trafficking in scheduled drugs (cocaine base) (Count 3) (Class B), 17-A M.R.S. § 1103(1-A)(A) (2026), refusing to submit to arrest (Count 4) (Class E), 17-A M.R.S. § 751-B(1)(A) (2026), and two counts of criminal forfeiture (Counts 5 and 6), 15 M.R.S. § 5826 (2021).[2] On August 20, 2021, Johnson was indicted on the original six charges, plus a new charge of failure to give a correct name (Count 6) (Class E), 17-A M.R.S. § 15-A(2) (2026).[3]

---

[1] Title 17-A M.R.S. § 1105-A(1)(D) has since been amended though not in any way that affects this appeal. *See* P.L. 2021, ch. 396, § 4 (effective Oct. 18, 2021) (codified at 17-A M.R.S. § 1105-A(1)(D) (2026)).

[2] Title 15 M.R.S. § 5826 has since been amended though not in any way that affects this appeal. *See, e.g.*, P.L. 2023, ch. 196, § 1 (effective Oct. 25, 2023) (codified at 15 M.R.S. § 5826 (2026)).

[3] The second criminal forfeiture charge in the complaint became Count 7 in the indictment.

Johnson pleaded not guilty to Counts 1, 2, 3, 4, and 6, and denied Counts 5 and 7, the criminal forfeiture charges, in September 2021.

[¶3]  In May 2022, Johnson moved to suppress evidence stemming from his arrest on June 5, 2021, and moved to dismiss the charges against him.  On January 11, 2023, the court (*Stokes, J.*) held a hearing on Johnson's motion to suppress and denied the motion in a written order.

[¶4]  The court found the following facts, which are supported by competent evidence admitted during the suppression hearing, except as otherwise indicated.  *See State v. Barclift*, 2022 ME 50, ¶ 2, 282 A.3d 607.  On June 4, 2021, a law enforcement officer parked his cruiser in a parking lot on Mt. Vernon Avenue in Augusta.  From this position, he could see Boothby Street. The officer positioned himself in that location because that area had past incidents of drug activity.  A little after 9:30 p.m., the officer saw an SUV enter Boothby Street from State Street, turn around, and then leave Boothby Street thirty seconds later before heading up the hill on State Street.  The officer followed the SUV and saw that there was no light illuminating its rear license plate, so he pulled up behind the SUV and stopped it at about 9:44 p.m.

[¶5]  The officer approached the driver's side of the SUV and saw five people in the vehicle.  Using his flashlight, the officer saw three passengers in

the rear, none of whom were wearing seatbelts. The officer made direct eye contact with a male passenger nearest to the right rear door. This passenger had a light purple or blue backpack that was pulled up onto his shoulders, which the officer found unusual, and, due to the passenger's appearance, the officer also suspected that the man was trying to hide his identity.[4] The officer asked the driver for identification, and the passenger near the rear right door opened the door and began running. The officer commanded the man to stop, but the man did not listen and ran into a thick brush, toward Boothby Street.

[¶6] The officer chased the passenger but stopped his pursuit because the officer's radio and two magazines were knocked off his belt due to the combined effect of the darkness and the thick brush. The officer called dispatch from his cruiser and requested K-9 assistance for a search. He described the fleeing passenger as a Black male wearing a black sweatshirt, black pants, white socks, and white sneakers. The officer found his radio and magazines as well as a "'wad'" of cash wrapped in an elastic band, a cell phone, a plastic bag containing approximately 200 grams of cocaine, two smaller bags containing suspected cocaine base, and a purple "'rock'" suspected of being fentanyl. The

---

[4] The court noted that the officer testified that this passenger, whom the officer later identified as Johnson, was "wearing a hood tied around his neck such that only his eyes, his nose (described as being big) and some dreadlock braids were visible."

officer found the cell phone and cash on the path used by the fleeing passenger and found the drugs with K-9 assistance approximately ten feet off the same path. It had rained earlier in the evening, but the items recovered from the brush were not wet when the police found them, suggesting that the items had not been there very long.

[¶7] The next morning, the same officer returned to the same location from the night before on Mt. Vernon Avenue to conduct surveillance on Boothby Street. The officer used binoculars to observe Boothby Street because he suspected that the fleeing passenger would return for the discarded items. Around 8:00 a.m. on June 5, 2021, the officer saw a man crossing Boothby Street who he believed matched the description of the fleeing passenger. The officer could see that the man was Black with "dreads" and a backpack, wearing the same type of clothing as the fleeing passenger from the prior night, but without a hood. The officer saw the man cross Boothby Street and go between apartment buildings. A few minutes later, the officer saw a vehicle, a silver Volkswagen, leaving the area.

[¶8] The Volkswagen turned onto Mt. Vernon Avenue. The officer saw that the front passenger seat was missing the head rest and observed the passenger-side seat belt and the top of the passenger's head and curly hair. The

6

officer followed the vehicle, believing that this passenger was the fleeing passenger from the night before. The passenger was leaning back in his seat, suggesting to the officer that the passenger was attempting to conceal his presence or identity. The officer "paced" the Volkswagen and determined that it was traveling at thirty-three miles per hour in a twenty-five-mile-per-hour zone.

[¶9] The Volkswagen stopped at a red light. While the Volkswagen was stopped, the officer positioned his cruiser behind the Volkswagen, and another officer intercepted the Volkswagen by cutting in front. Several officers approached the Volkswagen with their weapons drawn and removed the passenger, who was eventually identified as Johnson. Johnson was wearing clothing identical to what the fleeing passenger from the previous evening had worn, namely, a black shirt, a white t-shirt, black sweatpants, white socks, and white sneakers. Johnson's clothes and shoes were stained with mud and grass. The officer found a black sweatshirt and a purple backpack on the passenger-side floor of the Volkswagen. The officer identified Johnson as the fleeing passenger from June 4, 2021.

[¶10] The court concluded that the officer had a reasonable, articulable suspicion to stop the vehicles on June 4 and June 5, 2021. For the June 4 stop,

the officer had specific and articulable facts supporting his suspicion that the rear-license-plate light was out on the SUV, which would be a motor vehicle violation.[5] For the June 5 stop, the officer was able to determine that the Volkswagen was speeding. Additionally, the court concluded that the officer was objectively reasonable in suspecting that the passenger in the Volkswagen, later identified as Johnson, was the fleeing passenger from the night before because his appearance on June 5 was similar to his appearance on the night of June 4.

[¶11] The court also concluded that the officer's identification of Johnson as the fleeing passenger was "sufficiently reliable that a jury may consider it," and that ultimately the determination of the reliability of the identification would be up to the jury. The court therefore denied Johnson's motion to suppress the officer's identification of Johnson and any evidence flowing from the stops on June 4 and 5, 2021, and denied his motion to dismiss.

[¶12] On July 25, 2023, Johnson filed a motion for discovery of the disciplinary records of the officer who stopped him. The court (*Worth, A.R.J.*) held a hearing on this motion on August 29, 2023, and issued an order requiring

---

[5] The court concluded that this was likely a violation of 29-A M.R.S. § 1909 (2021), "and/or a malfunctioning light bulb in violation of the inspection manual requirements." Title 29-A M.R.S. § 1909 has since been amended but not in any way that affects this appeal. *See* P.L. 2021, ch. 216, § 45 (effective Oct. 18, 2021) (codified at 29-A M.R.S. § 1909 (2026)).

8

the Augusta Police Department to complete a "Law Enforcement Officer Giglio Inquiry" form and requiring the State to provide all disciplinary records for the officer from the Police Department. The court's order was not entered until September 20, 2023, and the court did not provide a deadline to produce this discovery.

[¶13] Six months later, on March 1, 2024, Johnson filed a motion pursuant to M.R.U. Crim. P. 16(e) for sanctions and dismissal for the State's failure to provide the officer's disciplinary record. At that point, jury selection for the trial was scheduled for March 7, 2024. The court (*Murphy, J.*) continued the trial and then scheduled a hearing on the motion for sanctions.

[¶14] The court held the hearing on the motion for sanctions on May 3, 2024. At the hearing, Johnson disclosed that the State sent the ordered discovery on March 1, 2024, approximately six months after the court ordered discovery, upon receiving Johnson's motion for sanctions. Johnson argued that the State's primary evidence at trial would be the officer's testimony, and therefore it was vital for him to receive the information relating to the officer's ability to act carefully and prudently when considering the facts before him. Johnson requested that the court dismiss the case as an appropriate sanction because the officer's testimony was the crux of the State's evidence and because

the court needed to send a message to the State to comply with discovery orders. In the alternative, Johnson requested the exclusion of the testimony of a different witness—who also identified Johnson—and related evidence.

[¶15] The State conceded that there was a discovery violation and agreed to the exclusion of the other witness who identified Johnson and related evidence. The Deputy Chief of the Augusta Police Department testified at the hearing and explained that there had been miscommunication within the Police Department and with the city attorney regarding the status of the production of the documents.[6] The Deputy Chief also testified regarding the nature of the disciplinary records for the officer and the Police Department's disciplinary policies. The officer's reprimands occurred on different dates from 2018 to 2024 and involved his failure to gather all information needed before conducting a search, his discharge of a firearm in an unsafe manner, his failure to update dispatch with his location, and his misuse of a police vehicle.

[¶16] At the conclusion of the testimony, the court requested that each party provide the court with a brief memorandum regarding whether there was

---

[6] The Deputy Chief testified to the following. The Police Department received the discovery request from the District Attorney's Office on September 27, 2023. The Police Department sent the discovery materials to the city attorney in October 2023 for review. The city attorney returned the materials to the Chief of Police around December 2023 or January 2024, but the officer in charge of providing the materials to the State was not alerted of the return. Only upon request from the State on March 1, 2024, did the Police Department realize the mistake and provide the materials to the State.

a *Giglio* violation and, if so, what the sanctions should be. Johnson argued in his memorandum that although none of the officer's reprimands involved dishonesty or untruthfulness, they were evidence needed for impeachment of the officer as they relate to his inability to collect information before acting—his credibility—and were therefore *Giglio*[7] and *Brady*[8] material. The State asserted that the reprimands were not *Brady* or *Giglio* material because they did not involve the officer's truthfulness or bias.

[¶17] On July 3, 2024, the court entered a brief handwritten order granting in part Johnson's motion for sanctions. The court found that the State committed a serious discovery violation, stating, "It is completely unacceptable for the defense to have to wait for the State to comply" with such a clear order from the court. However, the court stated that it could not find that the disciplinary records were *Brady* or *Giglio* material because the records did not involve dishonesty or untruthfulness. The court did not dismiss the case but

---

[7] *Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule" requiring disclosure of information favorable to the accused).

[8] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the prosecution cannot suppress "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment"); *see also State v. Twardus*, 2019 ME 58, ¶ 32, 72 A.3d 523 ("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching . . . ." (quotation marks omitted)).

instead ordered the exclusion of the testimony of the other witness who could identify Johnson and all related evidence, including evidence regarding a cell phone seized on June 5, 2021.

[¶18]  The court (*Daniel Mitchell, J.*) held a jury trial on August 29 and 30, 2024.  The jury found Johnson guilty on Counts 1, 2, 3, and 4 and acquitted Johnson on Count 6, failure to give a correct name.  The court ordered the forfeiture of funds under Counts 5 and 7.

[¶19]  Johnson's sentencing occurred on November 26, 2024.  The sentencing court conducted a *Hewey* analysis for Counts 1 and 2, the lead charges.  In the first step in the analysis, the court determined that the quantity of drugs was significant, placing the case at the higher end of the scale of the seriousness of the way in which the offense could have been committed.  The court set the basic sentence at twelve years of incarceration.

[¶20]  For the second step of the *Hewey* analysis, the court considered Johnson's mitigating factors, such as his lack of an adult criminal record, his behavior after his arrest, his family obligations, and his acceptance of responsibility.  For the aggravating factors, the court considered the "large amount of fentanyl and cocaine in this case seized from Mr. Johnson at the time of his arrest," the fact that Johnson fled from the police and was not arrested

12

until the following day, his juvenile record, and the fact that "he engaged in the sale of highly dangerous narcotics for pecuniary gain." Ultimately, the court found that the mitigating factors outweighed the aggravating factors and reduced the basic sentence by three years, setting the maximum sentence at nine years of incarceration. For the third step of the analysis, the court set Johnson's sentences on Counts 1 and 2 to run concurrently at nine years of incarceration with all but seven years suspended,[9] followed by three years of probation.[10]

[¶21]  The court entered a final judgment on December 11, 2024. Johnson timely filed an appeal. M.R. App. P. 2B(a)(1), (b)(1).

## II. DISCUSSION

### A.    Motion to Suppress

[¶22]  Johnson challenges the trial court's denial of his motion to suppress relating to the June 5, 2021, stop, arguing that the vehicle stop was unlawful under the Fourth Amendment to the United States Constitution.[11]

---

[9] Johnson filed a motion with the Law Court on September 17, 2025, requesting that this Court grant the sentencing court leave to correct a clerical error that omitted the suspended sentence as to Count 2. We granted the motion on September 19, 2025.

[10] The court set a sentence on Count 3 at five years of incarceration and a sentence on Count 4 at six months of incarceration, both to run concurrently with the sentences on Counts 1 and 2.

[11] Johnson has not argued, before the trial court or on appeal, that the vehicle stop constituted a violation of his rights under the Maine Constitution, and instead only briefly referenced the Maine

Johnson does not appeal the court's decision relating to the June 4, 2021, stop, or the officer's identification of Johnson. He contends that the stop on June 5, 2021, was a "de facto arrest" requiring probable cause as the basis to detain Johnson and that it was not a *Terry* stop requiring only a reasonable, articulable suspicion. The State argues that the June 5 stop was not an arrest and instead constituted an investigatory stop supported by a reasonable, articulable suspicion arising from the car's speed and the officer's suspicion that Johnson was the fleeing passenger from the night before.

[¶23] "'The denial of a motion to suppress is reviewed for clear error as to factual issues and de novo as to issues of law.'" *State v. Lovell*, 2022 ME 49, ¶ 18, 281 A.3d 651 (quoting *State v. Fleming*, 2020 ME 120, ¶ 25, 239 A.3d 648). We uphold the trial court's denial of a motion to suppress "if any reasonable view of the evidence supports the trial court's decision." *State v. Ouellette*, 2024 ME 29, ¶ 11, 314 A.3d 253 (quotation marks omitted).

[¶24] The Fourth Amendment to the United States Constitution forbids unreasonable searches and seizures. U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968). An investigatory stop is a reasonable seizure if it is based on a reasonable, articulable suspicion that criminal activity has occurred, is

Constitution in his motion to suppress submitted to the trial court. Therefore, our analysis rests on the United States Constitution. *See State v. Hemminger*, 2022 ME 32, ¶ 15 n.6, 276 A.3d 33.

14

occurring, or imminently will occur. *See State v. Vaughan*, 2009 ME 63, ¶ 10, 974 A.2d 930; *Terry*, 392 U.S. at 21-22.

[¶25] An investigatory stop, or *Terry* stop, "must be limited in scope and executed through the least restrictive means." *State v. Donatelli*, 2010 ME 43, ¶ 12, 995 A.2d 238 (quotation marks omitted). *Terry* stops are analyzed for constitutionality with a two-step process, considering (1) "whether the officer's action was justified at its inception" and (2) "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quotation marks omitted). "'Where police actions taken during the detention exceed what is necessary to dispel the suspicion that justified the stop, the detention may amount to an 'arrest' and is lawful only if it is supported by probable cause.'" *State v. Langlois*, 2005 ME 3, ¶ 8, 863 A.2d 913 (quoting *Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004)) (alteration omitted). In evaluating whether police actions exceed what is necessary, we weigh "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Donatelli*, 2010 ME 43, ¶ 13, 995 A.2d 238 (quoting *State v. Huether*, 2000 ME 59, ¶ 8, 748 A.2d 993).

[¶26]  Johnson concedes that the officer had reasonable suspicion to initially conduct a *Terry* stop on June 5, 2021, to verify his suspicion that Johnson was the fleeing passenger.  However, Johnson argues that the officer's stop of the Volkswagen exceeded the scope of a *Terry* stop and that the officer therefore needed probable cause to stop the silver Volkswagen, which, Johnson claims, he did not have.

[¶27]  We first address whether the officer's actions exceeded the scope of a *Terry* stop, using the factors outlined in *Donatelli* above.  *See Donatelli*, 2010 ME 43, ¶ 13, 995 A.2d 238.  There is a significant State interest in detecting and stopping illegal drug trafficking.  *See id.* ¶ 14.  Johnson's seizure advanced this interest because the officer had a reasonable suspicion that Johnson was the fleeing passenger from the previous night who discarded quantities of cocaine, fentanyl, and cash.  *Cf. State v. White*, 2013 ME 66, ¶ 14, 70 A.3d 1226 (explaining that the State's interest in protecting the public from the threat of drunk drivers was advanced by the defendant's seizure).

[¶28]  Additionally, the interference with Johnson's individual liberty was not so severe as to constitute a de facto arrest.  *See Donatelli*, 2010 ME 43, ¶ 13, 995 A.2d 238.  Although Johnson is correct that multiple officers drawing firearms can constitute a de facto arrest, the officers' presence alone is not

enough to tip the scale away from a *Terry* stop. *See id.* ¶¶ 14-16; *Langlois*, 2005 ME 3, ¶ 10, 863 A.2d 913 (holding that the defendant was subject to an investigatory detention and not an arrest when the officer ordered him at gunpoint to lie down). The officer suspected Johnson of being the fleeing passenger who possessed illegal drugs and cash, that suspect did not listen to commands from the officer to stop running on June 4, Johnson was not alone in the vehicle on June 5, and the detention lasted for less than three minutes before Johnson was arrested based on probable cause. As such, the actions taken by the officers to stop Johnson were "reasonably related in scope to the circumstances which justified the interference in the first place" and therefore did not constitute a de facto arrest. *Langlois*, 2005 ME 3, ¶ 10, 863 A.2d 913 (quotation marks omitted); *see Donatelli*, 2010 ME 43, ¶¶ 15-17, 995 A.2d 238; *see also United States v. Chaney*, 647 F.3d 401, 409-10 (1st Cir. 2011) (concluding that there was not a de facto arrest when officers used handcuffs and drawn handguns because there were multiple suspects in a dark, small hotel room who ignored repeated orders from officers and the detention lasted less than five minutes).

[¶29] Because the stop on June 5, 2021, was a lawful *Terry* stop, only reasonable suspicion was needed to support the stop. *See State v. Lepenn*, 2023

ME 22, ¶ 16, 295 A.3d 139. Johnson conceded that reasonable suspicion existed given the officer's suspicion that Johnson was the fleeing passenger. The officer then clearly saw Johnson once he was detained and quickly located the purple backpack and black sweatshirt in the front seat of the car, at which point the officer had probable cause to arrest Johnson. *See Langlois*, 2005 ME 3, ¶ 11, 863 A.2d 913 (holding that once the officer discovered illegal drugs in the defendant's pocket, he had probable cause to arrest the defendant). Therefore, the court did not err by denying the motion to suppress.

## B.     Discovery Sanctions

[¶30] Johnson argues that the court abused its discretion by declining to dismiss the case as a sanction for the State's discovery violation. Johnson asserts that dismissal was the only remedy capable of vindicating Johnson's rights because the case had already been pending for three years, the court needed to impose a significant sanction to deter repeated discovery violations, and Johnson did not receive a fair suppression hearing because he did not have the officer's disciplinary information. The State argues that the court's sanction was sufficiently tailored to the circumstances and that the sanction was significant because the court excluded an eyewitness who could identify Johnson in a case in which identification was a key issue.

[¶31]  It is undisputed that the State committed a discovery violation by failing to produce the officer's disciplinary records and the Law Enforcement Giglio Inquiry form as ordered by the court.  Therefore, only the form of the court's sanction needs our review.  *State v. Page*, 2023 ME 73, ¶ 13, 306 A.3d 142.  We review for an abuse of discretion a trial court's sanction for a discovery violation.  *State v. Reed-Hansen*, 2019 ME 58, ¶ 17, 207 A.3d 191.  In our review, "[w]e look for a prejudicial effect on the defendant as a result of the discovery violation, as mitigated—or not—by the trial court's ruling," *State v. Poulin*, 2016 ME 110, ¶ 28, 144 A.3d 574, and will overturn a jury verdict on appeal only if the effect deprived the defendant of a fair trial, *State v. Lowery*, 2025 ME 3, ¶ 25, 331 A.3d 268.

[¶32]  We agree with Johnson that the State's failure to provide the disciplinary records in a timely manner was a serious discovery violation.  However, Johnson's argument that dismissal was the only appropriate sanction because the disciplinary documents—which he did not receive until March 2024—were necessary at the suppression hearing in early 2023 is unpersuasive.  The disciplinary documents would not have been admissible at the suppression hearing for the court to consider as the fact finder because the documents are character evidence and they do not implicate the officer's

credibility as to his truthfulness. *See Lovell*, 2022 ME 49, ¶ 8, 281 A.3d 651 ("The Maine Rules of Evidence apply to hearings on motions to suppress."); M.R. Evid. 404(a), 607-608. None of the reprimands in the officer's records involve his truthfulness or untruthfulness, nor are they *Brady* or *Giglio* material. *See State v. Jobin*, 510 A.2d 527, 529 & n.2 (Me. 1986) (noting that the officer's personnel records were not in any way probative of truthfulness or untruthfulness); *cf. Reed-Hansen*, 2019 ME 58, ¶¶ 14-15, 207 A.3d 191 (concluding that the State violated *Brady* obligations and M.R.U. Crim. P. 16(c) by failing to disclose a video that contained evidence of an exculpatory nature and evidence that was relevant and material to the preparation of the defense).

[¶33] The reprimand that Johnson argues was the most important *Brady* or *Giglio* material constituted character evidence involving an unrelated event that occurred three years prior to Johnson's arrest in which the officer did not gather all the facts before conducting a search. This reprimand speaks to the officer's character to act in a similar way, which is inadmissible, and does not speak to the officer's truthfulness. M.R. Evid. 404(b). In fact, the trial court ruled that it was inadmissible when Johnson later attempted to introduce the reprimand as evidence at trial. Therefore, an earlier production of the reprimand documents would not have affected the suppression hearing

because the documents were not admissible at that hearing. Any further prejudice from not having the reprimand documents was sufficiently mitigated because Johnson had three months to review the documents in preparing his defense and he later unsuccessfully attempted to introduce them for impeachment at trial. *See State v. Pelletier*, 2023 ME 74, ¶ 34, 306 A.3d 614.

[¶34] Moreover, the court's sanction excluding the only other witness who could identify Johnson was an extraordinary punishment for a serious violation. *See Reed-Hansen*, 2019 ME 58, ¶ 17, 207 A.3d 191 ("[T]he suppression of a necessary witness's testimony is an *extreme* sanction." (emphasis added)). A key issue at trial was the identification of Johnson as the passenger from June 4, 2021, and the State was appropriately punished by being made to rely on only the officer's testimony and dashcam video to support identification of Johnson as that suspect. Therefore, the court did not abuse its discretion.[12]

---

[12] Johnson's argument that dismissal was required because the case had already been pending for three years is also unpersuasive. While the State failed to produce the ordered discovery for six months, the State was not the sole cause of the continued delay of the trial date—it was delayed for other reasons—and complete dismissal would be disproportionate to any prejudice caused by a delay in discovery. Moreover, a motion raising a violation of the right to a speedy trial is the proper vehicle to address a significant delay in trial. *See Winchester v. State*, 2023 ME 23, ¶ 29, 291 A.3d 707.

## C.    Sentencing

[¶35]   Johnson argues that the sentencing court erred by "double counting" the quantity of drugs that he trafficked in setting both the basic and maximum sentences.  Johnson contends that there is a reasonable probability that he would have received a lesser sentence if the sentencing court did not consider the quantity of drugs as an aggravating factor in the second step of the sentencing analysis after properly considering the quantity of drugs in the first step of the analysis.  The State concedes that the reference to the quantity of drugs in the second step of the analysis was plain error but argues that Johnson's substantial rights were not affected because the sentencing court weighed the mitigating factors so significantly against the aggravating factors that it reduced the basic sentence by three years.

[¶36] Johnson did not raise any objections to the sentencing court on this issue, and therefore we review it for obvious error.  *State v. Miller*, 2005 ME 84, ¶ 11, 875 A.2d 694.  An error is obvious "when there is (1) an error, (2) that is plain, and (3) that affects substantial rights." *State v. Watson*, 2024 ME 24, ¶ 18, 319 A.3d 430 (quotation marks omitted).  A sentencing error affects substantial rights when there is a "reasonable probability that, but for the error, the sentencing court would have imposed a different, more favorable sentence."

*State v. Goncalves*, 2025 ME 70, ¶ 46, 340 A.3d 639 (alteration and quotation marks omitted).  Should these conditions be met, we must also consider whether "the error seriously affects the fairness and integrity or public reputation of judicial proceedings before we vacate a judgment on the basis of the error."  *Id.* ¶ 43 (quotation marks omitted).

[¶37]  A sentencing court must follow the three-step *Hewey* analysis when creating a sentence for a Class A, Class B, or Class C crime.  17-A M.R.S. § 1602(1) (2024);[13] *see State v. Hewey*, 622 A.2d 1151, 1154-55 (Me. 1993).  In step one, "the court [must] determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the individual."  *State v. Ellis*, 2025 ME 56, ¶ 17, 339 A.3d 794 (quotation marks omitted).  In step two, "the court [must] determine the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case."  *Id.* (quotation marks omitted).  Some factors include, but are not limited to, the individual's criminal history, the protection of the public interest, and the effect of the offense on the victim.  *Id.*  While the same set of *facts* may make up the factors that the court considers at each step, the court may not consider the

---

[13]  Title 17-A M.R.S. § 1602(1) has since been amended but not in any way that affects this appeal. *See, e.g.*, P.L. 2025, ch. 420, § 1 (effective Sep. 24, 2025) (codified at 17-A M.R.S. § 1602(1) (2026)).

same *factor* for the same purpose at both step one and step two of the analysis. *Id.* ¶ 18.

[¶38]  Here, as the State also concedes, the sentencing court committed plain error by considering the scale of the possession of drugs at both step one and two for the same purpose.[14]  *Cf. State v. Plummer*, 2020 ME 143, ¶¶ 15-17, 243 A.3d 1184 (holding that the court did not err when it discussed the defendant's drug trafficking in steps one and two because the court assessed the scale of the trafficking in step one but the commercial motive of the trafficking in step two); *State v. Murray*, 2026 ME 61, ¶¶ 21-22, --- A.3d --- (explaining that the court did not double count the defendant's grooming of the victims because the court considered the defendant's "grooming in determining the seriousness of the conduct" at step one but the "subjective *impact* that [the defendant's] grooming had on the victims" at step two of the sentencing analysis (emphasis added)).  The court did not elaborate on the context or impact of the large amounts of drugs as an aggravating factor, simply noting the quantity—no different from what it did in its consideration of the quantity of

---

[14] During step one, the sentencing court stated, "I think the quantities of the drugs involved in this case are significant, and [] they place Mr. Johnson in the higher end of the scale compared to other ways in which these crimes could have been committed.  I don't think this is one of those cases where an individual defendant just barely meets the legal definition of trafficking."  For step two, the court stated, "As far as aggravating factors go, the Court believes that the large amount of fentanyl and cocaine in this case seized from Mr. Johnson at the time of his arrest are aggravating factors."

24

drugs at the first step of the sentencing analysis. There would be no error, for example, if the court had considered the quantity of drugs trafficked at step one and then considered the *effect* of trafficking such a large quantity on public safety at step two. *See, e.g.*, *Plummer*, 2020 ME 143, ¶¶ 15-17, 243 A.3d 1184; *Ellis*, 2025 ME 56, ¶ 19, 339 A.3d 794; *State v. Sweeney*, 2019 ME 164, ¶¶ 18-19, 221 A.3d 130 (affirming the court's consideration of domestic violence at step one of the sentencing analysis in evaluating the objective elements of the charged incident and at step two of the analysis in examining the history of the relationship between the defendant and the victim).

[¶39] Holding that the court's sentencing determination was plain error, we look to whether the error affected Johnson's substantial rights.[15] If there is "a reasonable probability that, but for the error, the sentencing court would have imposed a different, more favorable sentence," then the error has affected

---

[15] We also note that the court's error here is not constitutional or structural in nature. In general, it is not improper for a court to consider the quantity of drugs as an aggravating factor in a drug-trafficking case, assuming that there is support in the record. *See* 17-A M.R.S. § 1602(1)(B); *State v. Bentley*, 2021 ME 39, ¶ 11, 254 A.3d 1171. The court did not make a consequential finding unsupported by evidence in the record, nor did it defy its statutory mandate. Either action would be more likely to require vacatur of the sentence. *See, e.g.*, *Goncalves*, 2025 ME 70, ¶¶ 45-46, 49, 340 A.3d 639 (requiring vacatur when the sentencing court's reliance on consequential facts not supported in the record was explicit and incontrovertible); *Ellis* 2025 ME 56, ¶¶ 25-28, 339 A.3d 794; *State v. Hodgkins*, 2003 ME 57, ¶ 8, 822 A.2d 1187 (explaining that "[a]n error affects the defendant's substantial rights when a court imposes a sentence that is not authorized by law"). This error is instead a creature of the *Hewey*-analysis process and procedure, and, under the obvious-error test, it cannot be an automatic vacatur because a defendant's substantial rights are not affected by an error that is not material. *See Goncalves*, 2025 ME 70, ¶¶ 48-49, 340 A.3d 639.

Johnson's substantial rights. *Goncalves*, 2025 ME 70, ¶ 46, 340 A.3d 639 (alteration and quotation marks omitted).

[¶40]  In step two of its analysis, the court noted as aggravating factors the large amounts of drugs involved along with Johnson's sale of these highly dangerous drugs for pecuniary gain.  These factors are obviously closely related, if not inextricably linked.  At the conclusion of step two, the court reduced the sentence by three years due to the significant mitigating factors that outweighed the aggravating factors.  Given the implicit tie between Johnson's pecuniary gain and the quantity of drugs sold, we cannot say that there is a reasonable probability that the sentence may have been reduced further had the court not made this error; in other words, the error is not material.  *See Goncalves*, 2025 ME 70, ¶ 49, 340 A.3d 639.  Thus, we are not convinced that this error in fact affected Johnson's substantial rights and therefore conclude that the court's actions do not amount to obvious error. *See id.* ¶ 48.  In light of this determination, we need not address whether this error under these circumstances seriously affects the fairness and integrity or public reputation of judicial proceedings.

### III. CONCLUSION

[¶41]   In sum, the court did not err by denying Johnson's motion to suppress because the stop on June 5 was a lawful *Terry* stop.  Nor did the court abuse its discretion by declining to dismiss the case as a discovery sanction and instead precluding the State from presenting a key witness and offering significant relevant evidence.  We reiterate that the State's discovery violation was serious and concerning, but the court's sanction was extraordinary and sufficiently addressed the violation.   Finally, we hold that although the sentencing court erred by referencing the quantity of drugs involved in this case at both step one and step two of the sentencing analysis, the error did not affect Johnson's substantial rights, and we therefore affirm the judgment.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Donte Johnson

Maeghan Maloney, District Attorney, and Tyler J. LeClair, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2021-750
FOR CLERK REFERENCE ONLY